BERNARD N. WOLFMAN *vs.* MODERN LIFE INSURANCE COMPANY.

Suffolk. March 8, 1967. — April 7, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Insurance,* Unauthorized Insurers' Process Act, Foreign company, Beneficiary, Assignment of policy. *Jurisdiction,* Foreign insurance company. *Constitutional Law,* Due process of law, Insurance company.

An assignee of a policy of life insurance providing that "An assignment . . . shall operate to the extent thereof to transfer the interest of any Beneficiary whom the assignor has the right to change" was a "beneficiary" of the policy within the meaning of the Unauthorized Insurers' Process Act, G. L. c. 175B. [361–362]

In an action against a New York life insurance company with service of process under the Unauthorized Insurers' Process Act, G. L. c. 175B, conclusions that the defendant had made a delivery in Massachusetts of an insurance policy to the plaintiff, a resident here, and that it had engaged in the "transaction of [other] business" and performed "acts" here bringing it within the statute were warranted by evidence that, in a telephone conversation between the plaintiff here and the manager of the company in New York preceding issuance of the policy, the plaintiff stated that he was taking an absolute assignment thereof from the insured and would pay the premiums thereon and requested that the policy be mailed to him, and the manager undertook to do so, that then the company mailed the policy to the plaintiff, either directly or via the soliciting agent in New York in accordance with its established practice, and mailed a copy of the assignment, and that thereafter by mail the defendant dealt with the plaintiff in matters connected with premiums on the policy. [362–364]

Wolfman *v.* Modern Life Ins. Co.

The Unauthorized Insurers' Process Act, G. L. c. 175B, as applied to subject to suit thereunder in Massachusetts a New York life insurance company not served with process here, did not "offend traditional notions of fair play and substantial justice" and met the constitutional requirements of due process although it appeared that the company's only business activity in Massachusetts dealt with a single policy and was only with a resident of Massachusetts who was an assignee of the policy from the insured.   [366–367]

CONTRACT.   Writ in the Superior Court dated May 26, 1965.

Certain findings and rulings were reported by *Kalus,* J.

*John M. Hall* (*John A. Fiske* with him) for the defendant.

*Edward L. Schwartz* for the plaintiff.

WHITTEMORE, J.   This is an action by a Massachusetts resident as an assignee of a policy of insurance issued by the defendant (Modern Life), a New York corporation, on the life of John R. Stricker, a resident of Maryland, who died in New York on February 10, 1965.   The stated beneficiary of the policy was the estate of the insured.

The action is brought under the Unauthorized Insurers' Process Act, G. L. c. 175B which, in § 2 (a), provides, "Any of the following acts in this commonwealth, effected by mail or otherwise, by an unauthorized foreign or alien insurer: (1) the issuance or delivery of contracts of insurance to residents of this commonwealth or to corporations authorized to do business therein; (2) the solicitation of applications for such contracts; (3) the collection of premiums, membership fees, assessments or other considerations for such contracts; or (4) any other transaction of business, is equivalent to and shall constitute an appointment by such insurer of the commissioner of insurance and his successor or successors in office, to be its true and lawful attorney, upon whom may be served all lawful process in any action, suit or proceeding instituted by or on behalf of an insured or beneficiary arising out of any such contracts of insurance, and any such act shall be signification of its agreement that such service of process is of the same legal force and validity as personal service of process in this commonwealth upon such insurer."

The defendant in an "Answer in Abatement and Plea to the Jurisdiction" set up that it has never been present or done business in Massachusetts, nor engaged in any of the activities enumerated in G. L. c. 175B, § 2. After a hearing on the plea, the judge made findings and overruled the plea. He found that activities of the defendant in respect of the policy in suit brought the defendant under G. L. c. 175B. The issue is here on his report as to the rightness of his findings and rulings.

Most of the facts are not in dispute. Modern Life was incorporated in New York in 1962 and has had an office there ever since. Stricker, on March 18, 1964, applied in New York City to Modern Life for a life policy in the amount of $50,000, and submitted there to a medical examination. The application was filed through an insurance broker, Alfred Sacks. Modern Life issued policy 001942 in New York City and delivered it to Stricker in New York City "through Al Sacks." Shortly thereafter Stricker asked Sacks for assignment and policy change forms and these were delivered by Sacks to Stricker in New York City.

On March 26, 1964, Stricker met with the plaintiff, Wolfman, in Wolfman's office in Boston bringing with him policy 001942. Wolfman's business was investments. During the meeting Wolfman telephoned Modern Life and spoke with Albert Sterlini, its manager of underwriting.

Wolfman testified as follows, much of his testimony being corroborated by Sterlini. Wolfman told Sterlini he understood that a $35,000 policy was in process of being issued to replace the $50,000 policy. Sterlini replied that he was aware of the entire transaction and that a policy of $35,000 was in process. Wolfman told Sterlini he was going to take an absolute assignment of the $35,000 policy and wanted to know what policy number to insert in the assignment forms. Sterlini told him the new policy would have the same number. Being asked what else would be required, Sterlini told Wolfman that Stricker should execute the policy change request to reduce the policy amount to

$35,000 and that Wolfman should return the $50,000 policy to Sterlini.  Wolfman asked to have the new policy mailed to him, and Sterlini said he would try to mail it directly to Wolfman's office that day.  Wolfman said that as the owner of the policy he intended to pay the premiums and asked the amount of the first quarterly premium.  At Sterlini's suggestion Wolfman called again in a short time and Sterlini informed him of the exact amount of that premium.

Also on March 26, 1964, Wolfman wrote Sterlini enclosing the policy, the policy change request, the assignment, and his check for $321.41 as the initial quarterly premium. The letter stated his understanding that the policy would be mailed directly to him and would be in effect immediately upon receipt of the enclosed premium payment.  It asked Modern Life to mail to him a receipt for the payment, and to note in its records that Wolfman was the absolute assignee of policy 001942 "and then return the original to me duly endorsed"; and also to note that duplicate premium notices should be sent to him, as he proposed to pay all future premiums.

Under date of March 30 Sterlini wrote Wolfman.  The letter acknowledged the check, enclosed a copy of the policy change request and the assignment, and stated, "We have also noted in our files in accordance with the instructions in your letter of March 25.  Should you have any questions, don't hesitate to call us."  Wolfman received the policy under separate cover.  Sterlini testified that he mailed the $35,000 policy to Sacks, "our agent."

Wolfman wrote Modern Life on April 17, 1964, stating that he would like to prepay premiums through June 28, 1966, and asking what the figure would be and if the check should be mailed to the home office.  He wrote again on April 27 asking for a reply to the April 17 letter.  On May 1, 1964, Sterlini wrote Wolfman that the company's compound discount tables were applicable to annual premiums paid in advance with the initial annual premium. "Therefore, please have the enclosed policy change requests for a change from quarterly to an annual mode

signed. To provide coverage through June 1966, the new premium will be paid annually from July 1, 1964. We will discount the two annual premiums if payment is received before June 1, 1964. The two years premium payable in advance will be: $2,418.01."

On May 5 Wolfman, from Boston, mailed to Modern Life, attention of Sterlini, his check for the premium and also the policy change document which had been executed by Stricker in New York. On May 13, 1964, Modern Life's accounting department mailed a "Memo" to Wolfman acknowledging receipt of the advance premium and stating that the premiums on the policy were paid through July 1, 1966. The two premium checks were drawn on and collected from a Boston bank.

Wolfman, in New York, on March 2, 1965, executed and, through an attorney, mailed to the defendant, proof of loss and a certificate showing Stricker's death.

Each policy provided, "This policy shall not take effect until it has been delivered and the first premium paid during the lifetime of the Insured, except as otherwise provided in the receipt with the same number as the application." There having been no premium paid prior to Wolfman's payment of March 26, 1964, no policy became an effective contract prior to that date nor otherwise than in accordance with the provision quoted above. The policies also provided that no assignment would be recognized until duly filed at the home office of the company and that "An assignment . . . shall operate to the extent thereof to transfer the interest of any Beneficiary whom the assignor has the right to change, and to render proceeds to which the assignee is entitled payable in one sum . . . ."

The judge found that Modern Life, acting through Sterlini, "caused to be delivered to the plaintiff as owner and beneficiary in Boston, Massachusetts, a $35,000 policy . . . (replacing a $50,000 policy . . . originally issued and returned by the plaintiff) covering the life of . . . Stricker of . . . Maryland." He found the other relevant facts substantially as stated above, and that the "defendant did not otherwise do business in Massachusetts."

THE APPLICABILITY OF THE STATUTE APART FROM THE
CONSTITUTIONAL ISSUE.

1. The ruling was right that Wolfman is a "benefici-
ary" within the meaning of c. 175B. Many contracts of
insurance have no stated beneficiaries as do life policies.
Under some such contracts, persons not named, or specified
by category as persons having rights under policies, do
have rights directly against the insurer. See, for example,
G. L. c. 214, § 3, cl. (10), providing that the holder of a
judgment based on injury or death or property damage
may recover in equity from the insurer of the defendant.
A lower court in New York has held that such persons are
beneficiaries of the policy for the purposes of a statute like
c. 175B, that is, § 59–a of the Insurance Law. *Kaye* v.
*John Doe,* 204 Misc. (N. Y.) 719, 724–725 (motion to vacate
service denied). The reasoning is persuasive. The trial
judge said: "[T]he judgment creditors . . . are not mere
strangers . . . . [A]s the injured persons, they are within
one of the two classes of those distinctly intended and de-
sired to be protected by the statute . . . . True, a bene-
ficiary is usually named by the assured in certain types of
policies . . . . But section 59–a is not in any way ex-
pressly restricted to life or fire insurance contracts, and
there is no reason or justification for my imposing such a
limitation." Compare *Kennedy* v. *Long Island R.R.* 26
F. R. D. 589 (persons who are neither third-party bene-
ficiaries nor holders of matured claims against the insurer
are not beneficiaries nor "insureds"). Compare also
*Meridian Trading Corp.* v. *National Auto. & Cas. Ins. Co.*
45 Misc. 2d (N. Y.) 847 (assignee of a first mortgage, but
not of the policy, having no right to sue on the policy, is
not a beneficiary under § 59–a of the New York Insurance
Law merely because the policy originally named as "loss
payee" a prior first mortgagee).

Wolfman, being an assignee of the policy by virtue of
G. L. c. 231, § 5, had, at the time of its delivery, the right to

sue thereon.[1]  He had from and after its issuance a substantive beneficial interest under the contract.  The policy itself, in providing that the assignment transferred the interest of the "Beneficiary," recognized that in an important respect Wolfman moved into the beneficiary's position.  Wolfman's independent right to recover the proceeds gave him status as a person within the scope of c. 175B.  It cannot be said that all resident assignees are so surely beyond the interest of the State that the long arm statute should be construed to exclude them.  It is unimportant whether Stricker, the assignor, could have sued in Massachusetts in any circumstances.

2.  The acts done in Massachusetts brought Modern Life within the terms of the statute as written.  Evidence that the judge could have accepted supports the conclusion that Modern Life caused the policy to be delivered in Boston.  Wolfman had a right to delivery of the policy and had requested it.  Sterlini for Modern Life undertook to make such delivery.  The judge was not obliged to believe that the policy was delivered through Sacks.

A finding that Modern Life did mail the policy to Sacks would not require a different conclusion.  Sacks unquestionably was Stricker's agent in soliciting the original policy.  See New York Insurance Law, §§ 111, 119, 121; *Bohlinger* v. *Zanger,* 306 N. Y. 228, 231–232.  We assume that Modern Life may have sent the policy to the broker in accordance with an established practice, thus informing him of the accrual of his right to a commission.  We assume also that had Stricker then had a right to receive the policy, delivery to the soliciting broker would have been delivery to him.  But Stricker, after the changes of March 26, 1964, had no right to possession of the policy.  Although delivery of the policy was required to make it effective, the requirement was not of delivery to the insured.  As no statute or contract required delivery other than to Wolfman,

----

[1] This right by the statute is subject "to all defences and rights of counterclaim, recoupment or set-off to which the defendant would have been entitled had the action been brought in the name of the assignor . . . ."

and as, according to evidence, Modern Life had undertaken to deliver the policy to Wolfman, there is no reason to disregard the testimony of Sterlini that the mailing to Sacks was to "our agent." The inference is inescapable that if there was a mailing to Sacks it was with instructions to mail the policy to Wolfman.

In addition to delivering a contract of insurance to a Massachusetts resident, the insurer engaged in the "transaction of [other] business" here by mail and telephone. Sterlini's telephone conversations and letters, informing the owner of the policy of the premiums that would be due (resulting in the receipt of premiums mailed in Boston) and arranging for a change in the policy terms as to premium payments, as well as the delivery of Wolfman's copy of the assignment, are acts of business. In *Schutt* v. *Commercial Travelers Mut. Acc. Assn.* 229 F. 2d 158, 161 (2d Cir.), cert. den. 351 U. S. 940, the court held that the defendant's mailing of premium notices to Tennessee, receipt therefrom of premium payments, and the submission of proofs of death constituted doing business within the scope of a comparable Tennessee statute. The court said, "The company is at one end or the other of each of these activities . . . ." In *Zacharakis* v. *Bunker Hill Mut. Ins. Co.* 281 App. Div. (N. Y.) 487, 490 (leave to appeal granted, May, 1953, 281 App. Div. 1019), the court said: "When the defendant [in Pennsylvania] mailed its contract of insurance issued to a resident of New York, addressed to a New York broker; when it collected a premium for this policy by mail, sent from New York; and when by its manager it entered into correspondence as to the terms and conditions of the policy moving by mail in and out of New York, it came literally, we think, within the terms of the statute [Insurance Law, § 59–a] by which it constituted the Superintendent of Insurance its agent to receive process." Accord, *Dauphin Deposit Trust Co.* v. *Commercial Travelers Mut. Acc. Assn. of America,* 8 Misc. 2d (N. Y.) 210 (affd. 5 App. Div. 2d [N. Y.] 960). See also *McGee* v. *International Life Ins. Co.* 355 U. S. 220; *Aero Associates, Inc.* v.

*La Metropolitana,* 183 F. Supp. 357 (S. D. N. Y.); *Ross* v. *American Income Life Ins. Co.* 232 S. C. 433; *Security Natl. Life Ins. Co.* v. *Washington* (D. C. Mun. App.) 113 Atl. 2d 749; *United States Liab. Ins. Co.* v. *Handy* (D. C. Mun. App.) 173 Atl. 2d 208, 209.

The statute does not require dealings in the State with more than one person. It specifies "Any of the following acts in this commonwealth." We agree with the *Zacharakis* and *Aero Associates* cases, *supra,* in their holdings on this point under a like statute. The *Ross, Security Natl. Life* and *Handy* cases, *supra,* point the same way although the statutes are, in terms, more specifically applicable to acts related to only one policy.

Modern Life lays stress on the involuntary nature of its transaction with Wolfman and the distinction that, in the cases cited above, the insurer's dealing was with the insured and hence to its advantage in promoting its business. In our view, this distinction does not affect the literal applicability of the statute. We consider this aspect of the facts, however, in its bearing on the constitutionality of the statute as applied to Modern Life.

### THE REQUIREMENTS OF DUE PROCESS.

3. The requirement for the validity of the asserted power of a State to enter a binding judgment against a nonresident not served with process within its boundaries is that "he have certain minimum contacts with . . . [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[2] *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316. *McGee* v. *International Life Ins. Co.* 355 U. S. 220, 222. In *Hanson* v. *Denckla,* 357 U. S. 235, 253, where the issue was jurisdiction over a trust, the court said, with citation of the *International Shoe* case: "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within

---

[2] *Milliken* v. *Meyer,* 311 U. S. 457, 463.

the forum State, thus invoking the benefits and protections of its laws." Mr. Justice Goldberg (in denying an application for a stay in *Rosenblatt* v. *American Cyanamid Co.* 86 S. Ct. 1, 4) referred to The Growth of the Long Arm, 1963 U. of Ill. L. F., 533, 549, saying "[David P.] Currie has interpreted and generalized the Hanson test as a requirement 'that the defendant must have taken voluntary action calculated to have an effect in the forum state.'"

The constitutionality of basing service on multiple activities by mail within the State was established by *Travelers Health Assn.* v. *Virginia ex rel. State Corp. Commn.* 339 U. S. 643. That the requirements of due process are met by such a statute when the only activity in the State relates to the particular policy sued on is settled by the *McGee* case (355 U. S. 220, 222).

Modern Life contends, however, that its activity in Massachusetts not only related to a single policy, but also was involuntary. It suggests that, not having solicited the policy here, nor issued it for a Massachusetts resident, its dealings with Wolfman as assignee were only for Wolfman's accommodation in a business transaction, in connection with which it could not reasonably refuse to coöperate by furnishing the information Wolfman needed and completing for him his acquisition of an interest in the policy. It questions the soundness of the *Zacharakis* case (281 App. Div. [N. Y.] 487), and seeks to distinguish it on the ground that there the policy was delivered to the insured's agent and the correspondence in and out of New York by the Pennsylvania insurer was with the insured or his agent. See also the *McGee* case (355 U. S. 220) (suit by a beneficiary of a certificate of reinsurance issued and mailed by a Texas corporation to the beneficiary's son resident in California); the *Ross* case (232 S. C. 433) (suit by the insured for wrongful cancellation of a policy); the *Aero Associates* case (183 F. Supp. 357) (suit by insurers whose contracts had been reinsured by the defendants); the *Security Natl. Life* case (113 Atl. 2d 749) (jurisdiction based on the mailing to a beneficiary in Washington, D. C. of a certificate of insurance under a policy delivered in Missouri).

Wolfman *v.* Modern Life Ins. Co.

Commentators have noted that only minimal contacts with a State are required for jurisdiction over insurers and have mentioned selling within the State as only one of the factors supporting the decisions. We quote from a note in 73 Harv. L. Rev. 909, 928: "The furthest extension of jurisdiction based on an isolated contract has been in the insurance field. . . . [Certain cases described]. There are several factors present which explain the extended jurisdiction in these cases, although the more extreme results may not appear justifiable on an interest analysis. First, the Supreme Court has long recognized a unique state interest in insurance contracts. Second, in selling the policy to an out-of-state plaintiff the insurance company asserts its ability and willingness to investigate and pay claims within the forum. Finally, litigation is a normal part of the insurance company's business and should be regarded as a cost of making a profit within the forum." See also a note in 22 U. of Chicago L. Rev. 674, 684–685.

These cases and comments show one way in which the requirement of voluntary action within the State may be met. We think, however, that acts other than selling a policy may be voluntary business activity within the rule. Wolfman suggests that Modern Life could have declined to deal at all with Wolfman in Massachusetts. We agree with Modern Life that this would not have been a reasonable way to conduct its business. But this is so because it was doing business in the United States, across State lines, and to require that persons dealing with it come to New York would have adversely affected that business. Modern Life dealt with Wolfman in the way it did because of the way it chose to do business generally. We rule that this was "purposefully . . . [availing] itself of the privilege of conducting activities within the forum State." The maintenance of the suit in these circumstances "does not offend 'traditional notions of fair play and substantial justice.'"

The suggestion of the *Hanson* case may be that the constitutional test of fairness may be met apart from the issue of convenience, provided there is voluntary action within

the State. We assume, however, that inconvenience remains a factor to be considered in applying in the particular case the rule of fairness stated in *International Shoe Co.* v. *Washington*, 326 U. S. 310. We think that the inconvenience between a trial in Boston and a trial in New York City is not such as to be determinative.[3]

We recognize that no activity of Modern Life induced Wolfman to acquire his interest in the insurance contract. But he acquired an enforceable right under the policy only because of and in the course of business dealings in Massachusetts. Modern Life took its part in those dealings to serve its own interest in conducting its business appropriately and conveniently for those concerned with its product. This met the test of voluntary, purposeful activity, and to the extent that the test of inconvenience is applicable, such inconvenience as is suggested does not make it unfair to rule that G. L. c. 175B as applied to Modern Life on the facts is constitutional. We rule that it is.

*Order overruling "Answer in Abatement and Plea to the Jurisdiction" affirmed.*

---

[3] Although the issue is not presented whether the doctrine of forum non conveniens should be applied, see *Pinson* v. *Potter*, 298 Mass. 109, 114, we note that the facts do not suggest that jurisdiction should be declined on this ground. Compare *Universal Adjustment Corp.* v. *Midland Bank, Ltd. of London*, 281 Mass. 303, 315–316.